IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| IT'SUGAR LLC, ) | Civil Action No.: 4:13-cv-01644-RBH |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| I LOVE SUGAR, INC., THE M ) | |
| COY GROUP LLC, and BLU SOL ) | |
| DESIGN, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Plaintiff IT'SUGAR LLC filed this action against the above-captioned Defendants on June 17, 2013. The next day, Plaintiff filed a motion for a preliminary injunction against Defendant I Love Sugar, Inc. pursuant to Rule 65 of the Federal Rules of Civil Procedure and Title 15, Section 1116 of the United States Code. *See* ECF No. 8. It requests that the Court preliminarily enjoin I Love Sugar "from continuing to use any confusingly similar imitation of the unique and distinctive IT'SUGAR Trade Dress."[1] *Id.* at 1. The motion is now before the Court. The parties appeared

---

[1] Plaintiff also apparently seeks a preliminary injunction of "any trademark confusingly similar to Plaintiff's composite IT'SUGAR & Lollipop Design Mark in connection with Defendant's retail candy store . . . in Myrtle Beach." ECF No 8, at 1. However, while the Court notes Count V of Plaintiff's complaint alleges infringement of this unregistered trademark, Plaintiff does not again specifically address this issue, making this alleged trademark a mere part of its overall "Myrtle Beach Trade Dress." Specifically, to prevail on a claim of trademark infringement under the Lanham Act, a party must show (1) that it has a trademark that is valid, (2) that the trademark can be protected, and (3) that the defendant's use of an imitation of that trademark is likely to confuse consumers. *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 170 (4th Cir. 2006). The Court has some concern over possible confusion about the signage (particularly the three lollipop swirls at the parties' Myrtle Beach stores), but Plaintiff does not really argue in its brief or refer to the proper standard in showing that a preliminary injunction of the IT'SUGAR & Lollipop Design Mark is appropriate. Instead, its whole argument in its brief regards its trade dress claims, which require consideration of the *overall appearance* of Plaintiff's stores. Therefore, to the extent Plaintiff seeks an injunction of I Love Sugar's signage specifically, the Court denies Plaintiff's motion, as Plaintiff fails to show, under the appropriate standard, that it has a likelihood of succeeding on the merits.

before the Court for a September 30, 2013 hearing, and the motion was taken under advisement. After reviewing Plaintiff's motion and the parties' briefs, and considering the parties' arguments and supporting evidence, the Court denies Plaintiff's motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In this action, Plaintiff, a national candy retail store chain, claims several violations of federal trademark and state law resulting from Defendants' alleged infringement of its unregistered trade dress and trademark rights when Defendant I Love Sugar opened its sole candy store in Myrtle Beach, South Carolina, on June 1, 2013. Compl., ECF No. 1. Specifically (and relevant to this motion), Plaintiff asserts in its complaint that I Love Sugar, along with the involvement of Defendants The M Coy Group, LLC and Blu Sol Design, LLC,[2] are infringing both its "National Trade Dress" (the unique appearance if its standalone stores nationwide), as well as its "Myrtle Beach Trade Dress" (the unique appearance of its Myrtle Beach store). *Id.* at 21–23. Plaintiff has maintained a store since 2008 at Myrtle Beach's "Broadway at the Beach" shopping center, which is just a few minutes' drive from where I Love Sugar eventually opened its store. *Id.* at 7, 10.

Plaintiff filed its motion for a preliminary injunction on June 18, 2013. It requests that this Court stop the "rampant confusion" and prevent the "continued infringement of the distinctive IT'SUGAR trade dress and the IT'SUGAR & Lollipop Design trademark." Memo. in Supp. of Mot. for Prelim. Inj. 1, ECF No. 8-1. After a period of limited discovery, I Love Sugar filed its response on July 24, 2013. Memo. in Opp'n to Mot. for Prelim. Inj., ECF No. 38. The gist of much of I Love Sugar's argument (which the Court will address in more detail below) was that the components of Plaintiff's purported trade dress had already been used by other candy stores. Plaintiff replied on

---

[2] Plaintiff does not seek a preliminary injunction against M Coy Group and Blu Sol Design, which Plaintiff claims are both vendors with a past business relationship and familiarity with its stores and trade dress.

July 26, 2013. Reply in Supp. of Mot. for Prelim. Inj., ECF No. 47. The issues raised in the parties' briefs are now before the Court.

### PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary remedy that will be issued only upon a showing by a plaintiff of four requirements: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 558 U.S. 310 (2010) (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. "The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).

Because of the extraordinary nature of injunctive relief, the Supreme Court has admonished that interlocutory injunctions "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, S.Ct. 365 at 376. Only after the plaintiff makes a clear showing that he is likely to succeed on the merits and that he is likely to be irreparably harmed absent injunctive relief should a court consider whether the balance of equities tips in the plaintiff's favor. *See Real Truth*, 575 F.3d at 346–47. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, S.Ct 365 at 376 (citation omitted). Finally, a court must consider the public consequences of employing the extraordinary relief of an injunction. *Real Truth*, 575 F.3d at 347.

## LEGAL ANALYSIS

With the *Winter* preliminary injunction standard in mind, the Court now proceeds to a discussion of each factor of the preliminary injunction analysis. For the reasons the Court will explain below, it denies Plaintiff's motion.

Federal trademark law has long protected nonverbal trademarks known as "trade dress."[3] *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 763–66 (1992); *Ashley Furniture Indus. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 368 (4th Cir. 1999). Trade dress consists of the "total image and overall appearance," including "size, shape, color or color combinations, texture, graphics, or even particular sales techniques," of a product or establishment. *Two Pesos*, 505 U.S. at 765 n.1 (citations omitted). The purpose of trade dress protection is to "secure the owner of the trade dress the goodwill of his or her business and to protect the ability of consumers to distinguish among competing products." *Coach, Inc. v. Farmers Mkt. & Auction*, 881 F. Supp. 2d 695, 702 (D. Md. 2012) (citation omitted) (internal quotation marks omitted). It is well-established that the overall appearance of a retail establishment—including interior layout and fixtures—may constitute protectable trade dress. *See Two Pesos*, 505 U.S. at 769. "A claim of trade dress infringement requires proof of three elements: (1) the trade dress is primarily non-functional; (2) the trade dress is inherently distinctive or has acquired a secondary meaning; and (3) the alleged infringement creates

---

[3] Section 43 of the Lanham Act provides in pertinent part that:

> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin . . . of his or her goods . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

a likelihood of confusion." *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 657 (4th Cir. 1996).

In order for Plaintiff to prevail it must first prove that it has a likelihood of succeeding on each of the three elements of its trade dress claim. As noted above, Plaintiff defines two protected trade dress designs for the purposes of this action, its National Trade Dress and its Myrtle Beach Trade Dress. Plaintiff argues that the key component of its National Trade Dress is its "distinctive fixtures," which were custom designed. Memo. in Supp. of Mot. for Prelim. Inj. 2. Its bulk candy fixtures "feature three tiers holding round, acrylic candy bins shaped like bowls with adjacent recessed receptacles having scoops and bags that enable the customer to purchase any desired quantity of candy." *Id.* Some are backlighted, and all come in one of four shapes: round, bean, cloverleaf, and lollipop. *Id.* Plaintiff's stores also include lollipop fixtures, which are "vertical pole[s] on which six large circular discs are fastened at slanted angles." *Id.* at 3. Some of the lollipop fixtures include an additional arm for marketing banners. *Id.* Finally, Plaintiff identifies a third distinctive component to its stores: the "prominent use of large, irreverent, and funny photographs on the walls surrounding the sales floor of young women holding, wearing, or licking candy." *Id.* at 4. Plaintiff contends that all of these features combine to create its "cheeky" environment, conveying "optimism, indulgence, irreverence, spontaneity, boldness, energy, fashion, fantasy, pleasure, color, and fun in a single store." *Id.* at 2.

Furthermore, Plaintiff argues that its Myrtle Beach Trade Dress includes all of the elements of its National Trade Dress; however, the Myrtle Beach store adds several "unique and distinctive" aspects, which include the following:

> • [An e]xterior façade with large, colorful lollipop swirls in combination with the IT'SUGAR name. . . .
> • [A c]ash register "wrap" with a backlit base and a shelf displaying products. . . .

5

> • [A s]helved column display with non-candy merchandise. . . .
> • [A c]urved wall of M&M candies in long vertical dispenser tubes.

*Id.* at 6.

## I.     Inherent Distinctiveness and Secondary Meaning

One element Plaintiff must ultimately prove in order to succeed on the merits is that its trade dress is inherently distinctive or, alternatively, that it has acquired a secondary meaning. Plaintiff argues, somewhat inconsistently, that its National Trade Dress and Myrtle Beach Trade Dress designs are inherently distinctive *and* have acquired a secondary meaning. The Court addresses these issues in turn.

In analyzing inherent distinctiveness, the Fourth Circuit applies a methodology developed by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1979). "A court applying the *Abercrombie* analysis asks whether the [trade dress] in question is (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Ashley Furniture*, 187 F.3d at 369. "[S]uggestive, arbitrary, and fanciful marks 'are deemed inherently distinctive and are entitled to protection.' " *Id.* (citing *Two Pesos*, 505 U.S. at 768). Generic and descriptive marks, however, ultimately must acquire a secondary meaning for protection. *Id.*

Furthermore, the Fourth Circuit has approved of the principles stated in *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977) to guide the *Abercrombie* analysis. In *Ashley Furniture*, the Fourth Circuit noted as follows:

> The *Seabrook* court explained that in determining inherent distinctiveness a court looks to whether the alleged trade dress is "a 'common' basic shape or design," "unique or unusual in a particular field," or "a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods.

6

187 F.3d at 371 (quoting *Seabrook*, 568 F.2d at 1344). The Fourth Circuit recognized the *Seabrook* principles as an appropriate test for determining when "a trade dress should be considered arbitrary or fanciful, on the one hand, or generic, on the other." *Id.* It reasoned that "a product's overall design cannot be found inherently distinctive if it constitutes a 'well-known' or 'common' design, even if that design had not before been 'refine[d]' in precisely the same way. Rather, to qualify as inherently distinctive a design must be 'unique or unusual' in the 'particular field' at issue." *Id.* (quoting *Seabrook*, 568 F.2d at 1344).

In reviewing Plaintiff's motion, the Court finds, for the purposes of this motion, that Plaintiff has failed to show that its National Trade Dress and Myrtle Beach Trade Dress designs are inherently distinctive. Plaintiff states in a conclusory fashion that its "Trade Dress is inherently distinctive because the fixtures, graphics, and designs in the stores comprise a completely new, unique look that has not been used before for a candy store, and that consumers immediately associate with IT'SUGAR." Memo. in Supp. of Mot. for Prelim. Inj. 20. The Court, however, is not convinced that Plaintiff has sufficiently shown that its design is unique or unusual enough in the field of high-end candy retail stores to establish a *likelihood* that it will succeed in proving this element of trade dress infringement. For example, as I Love Sugar persuasively argues, other hip, high-end candy stores—before Plaintiff opened its first store in 2006—had been targeting similar consumers and using tiered white laminate fixtures. Memo. in Opp'n to Mot. for Prelim. Inj. 3–4, ECF No. 38. Taken together, Plaintiff fails to show that its trade dress is more than merely a refinement of a previous design that was emerging nationally in the early 2000s. As such, the Court must focus on whether Plaintiff has made an adequate showing that it will likely succeed in proving its trade dress has acquired a secondary meaning.

Secondary meaning exists if, "in the minds of the public, the primary significance of a . . . [mark] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc., v. Samara Bros.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 11 (1982)) (alterations in original). "[E]vidence of intentional direct copying establishes a prima facie case of secondary meaning sufficient to shift the *burden of persuasion* to the defendant on that issue . . . ." *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 448 (4th Cir. 1986) (emphasis added); *see also Osem Food Indus. Ltd. v. Sherwood Food Inc.*, 917 F.2d 161, 163 (4th Cir. 1990); *Campbell Sales Grp., Inc. v. Gramercy Park Design, LLC.*, No. 1:10CV55, 2010 WL 3945350, at *4 (M.D.N.C. Oct. 6, 2010). But that presumption is rebuttable after a "vigorous" examination of the evidence, which includes an analysis of "1) advertising expenditures; 2) consumer studies linking the mark to a source; 3) sales success; 4) unsolicited media coverage of the product; 5) attempts to plagiarize the mark; and 6) the length and exclusivity of the mark's use." *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Estrangers a Manaco*, 329 F.3d 359, 370 (4th Cir. 2003); *see also Campbell Sales*, 2010 WL 3945350, at *6; *Devan Designs, Inc. v. Palliser Furniture Corp.*, No. 2:91CV00512, 1992 WL 511694, at *10–12 (M.D.N.C. 1992), *aff'd*, 998 F.2d 1008 (4th Cir. 1993) (table opinion).

The Court is satisfied that Plaintiff has provided sufficient evidence that David Oaknin, the founder of I Love Sugar, intentionally incorporated elements of Plaintiff's defined trade dress. First, when Mr. Oaknin was in the process of developing the design and concept for the I Love Sugar store, he sought out many of the very same vendors used by Plaintiff who were familiar with Plaintiff's design. While most declined the work due to the conflict that would arise, Defendants M Coy Group, which had manufactured fixtures for several of Plaintiff's stores, Memo. in Supp. of Mot. for Prelim. Inj. 7, and Blu Sol Design, which had proposed a design for Plaintiff and had

8

"detailed knowledge of the overall look and direction that the IT'SUGAR stores were taking," *id.* at 7–8, opted to provide their services. Second, employees of some of Plaintiff's vendors attested in affidavits that Mr. Oaknin, when he was confronted about the similarity of I Love Sugar's store to Plaintiff's, made statements, such as "if it's not broken, why fix it"; "imitation is the sincerest form of flattery"; and "why invent the wheel?" Decl. of Randy Goldbaum 2–3, ECF No. 31-1; *see also* Decl. of Ashley Mady 2, ECF No. 13-4 ("We saw the work you did for IT'SUGAR and absolutely love all of their packaging and brand in general."); Decl. of Sean Roberts 2, ECF No. 13-5 ("[M]imicry is a form of flattery."). Finally, the exterior signage of the parties' Myrtle Beach stores is striking similar. Plaintiff's sign consists of its registered IT'SUGAR trademark against a background of three colorful lollipop swirls of different sizes.[4] The large swirl is in the middle, the next largest is to the right, and the smallest is on the left. The sign is featured prominently above the entrance of the Myrtle Beach store. *See* Decl. of Jeffrey Rubin, Ex. 11, ECF No. 11, at 28. Likewise, I Love Sugar's store also has three colorful lollipop swirls of different sizes above its entrance. The swirls are arranged in the same order as Plaintiff's. *See* Decl. of Jeffrey Rubin, Ex. 17, ECF No. 11, at 51.

This evidence is adequate *evidence* of copying by Mr. Oaknin of Plaintiff's purported trade dress. Yet, while I Love Sugar disputes copying Plaintiff's trade dress, it does not vehemently dispute that Mr. Oaknin copied only certain parts or elements of what Plaintiff defines as its overall trade dress. Instead, I Love Sugar argues that there is no evidence that Mr. Oaknin acted in bad faith, intending "to deceive the public and/or exploit Plaintiff's goodwill." Memo. in Opp'n to Mot. for Prelim. Inj. 31. It adds that "Mr. Oaknin did what is customary and logical in opening a new

---

[4] In Count V of Plaintiff's complaint, Plaintiff asserts a claim of federal trademark infringement of an unregistered mark, the "IT'SUGAR & Lollipop Design Mark" at its Myrtle Beach store. Compl. 27.

business—i.e., visiting similar businesses, speaking with and attempting to work with people in the industry, etc." *Id.* While this evidence of copying is sufficient to create a *presumption* that Plaintiff's trade dress has acquired a secondary meaning, that presumption is rebuttable by a showing "that secondary meaning does not exist." *See Campbell Sales*, 2010 WL 3945350, at *5–6. Thus, the Court must next determine whether I Love Sugar has adequately rebutted it. In doing so, the Court must address the six factors, noted above, and examine whether, in light of the evidence in the record, I Love Sugar has met its burden of persuasion. *See M. Kramer Mfg.*, 783 F.2d 421 at 448. The Court finds I Love Sugar has met its burden for the purposes of this motion for a preliminary injunction.

Plaintiff's advertising expenditures is the first consideration. Plaintiff argues that it has spent "in excess of $1 million advertising and promoting its brand in the past five years, consistently emphasizing the distinctive trade dress, cheekiness, and irreverence that create the unique environment of the IT'SUGAR stores." Memo. in Supp. of Mot. for Prelim. Inj. 21. In response, I Love Sugar points out that the relevance of the $1 million figure is questionable because "there is no evidence that any of Plaintiff's advertising used or incorporated its trade dress" in the advertising. Memo. in Opp'n to Mot. for Prelim. Inj. 26. Plaintiff provided several examples of its advertisements. Most featured young women enjoying candy in settings inconsistent with the trade dress Plaintiff has itself defined. Only one example includes a tiny photo showing a bean-shaped bulk candy fixture; no other element of Plaintiff's trade dress is in clear view. Ex. 8, Decl. of , Ex 8. Despite, its substantial advertising expenditures, the fact that Plaintiff has apparently not strongly advertised its *trade dress* does not favor an ultimate finding of secondary meaning. *See, e.g.*, *Rally's, Inc. v. Int'l Shortstop, Inc.*, 776 F. Supp. 451, 456 (E.D. Ark. 1990) ("After reviewing the advertisements, the Court is of the opinion that it is not the building or 'total package' that is the

focus of the advertisements, but rather it is the sign, the speed of service and the inexpensive nature of items served that is the focus.").

As for the second factor, the absence of a consumer study linking Plaintiff's trade dress to a source weighs against Plaintiff. I Love Sugar addresses this issue most closely in its rebuttal of Plaintiff's argument that confusion is likely. Particularly, I Love Sugar argued that Plaintiff's failure to conduct a confusion survey should lead this Court to draw an inference against Plaintiff. Memo. in Opp'n to Mot. for Prelim. Inj. 29. Plaintiff, of course, never addressed the issue of a consumer study in its brief, and there certainly is no evidence of one in the record before the Court. The only evidence Plaintiff has provided linking Plaintiff's trade dress to its source is evidence of confusion. That evidence is largely circumstantial, non-scientific, and culled from social media. *See, e.g.*, Decl. of Stacey Rapp 3, ECF No. 13-2 (attesting to customer inquiries); Supp. Decl. of Nicole Sheehan, Exs. C, D, E, ECF No. 47-10, at 22–27 (customer posts on social media). The Court is left to only *infer* from the evidence that "in the minds of the public" there is indeed a link. *Wal-Mart Stores*, 529 U.S. at 211. However, without any survey before it, the Court is hesitant to give this factor too much weight in ultimately determining whether, for the purposes of a motion for a preliminary injunction, Plaintiff has adequately shown secondary meaning. Furthermore, I Love Sugar should not be penalized for failing to conduct a study on its own. *See Devan Designs*, 1992 WL 511694, at *11 ("This court, in the absence of a clear mandate, feels disinclined to require every defendant who copies another's design to finance and obtain consumer surveys showing a lack of connection between product and producer in the eyes of the relevant public.").

Third, the significance of Plaintiff's sales success, in and of itself, is difficult to rebut. Plaintiff points to sales figures of a substantial sum, totaling $115 million over the last five years. Plaintiff also provides evidence that it maintains thirty-eight standalone stores, fourteen departments

11

within a store, and two kiosks. 2nd Decl. of Jeffrey Rubin, Exhibit A, ECF No. 47-2, at 2.  I Love Sugar, however, argues that, despite Plaintiff's evidence of sales success, "there is no evidence that [its] success is due to the alleged trade dress as opposed to other aspects of Plaintiff's business." Memo. in Opp'n to Mot. for Prelim. Inj. 26.  Indeed, while "[t]he size of a company and its sales figures are relevant evidence from which to infer the existence of secondary meaning . . . [, r]aw sales figures need to be put into context to have any meaning." 2 McCarthy on Trademarks & Unfair Competition § 15:49 (2009); *see also Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) ("Sales volume, though relevant, is not necessarily sufficient to indicate recognition of the mark by purchasers as an indication of the source." (citing *Seabrook Foods*, 568 F.2d at 1345)).  Plaintiff limits its purported trade dress to only its standalone stores, yet it does not distinguish the sales figures of its standalone stores from its other stores.  Nor does it give any context about how those figures compare to industry norms.  In light of I Love Sugar's argument, it is difficult to infer secondary meaning from the evidence in the record. *See Campbell Sales*, 2010 WL 3945350, at *8.

Fourth, I Love Sugar maintains that, while Plaintiff has provided evidence of unsolicited media coverage, it "fails to proffer a single piece of unsolicited media coverage which refers to its purported trade dress." Memo. in Opp'n to Mot. for Prelim. Inj. 26.  Plaintiff argues that "[t]he record is replete with evidence of . . . media touting the unique IT'SUGAR look." Reply in Supp. of Mot. for Prelim. Inj. 1.  However, the evidence of media attention that Plaintiff has proffered, in the Court's opinion, does not support a finding of secondary meaning in its trade dress.  The articles in the record are mostly about Jeffrey Rubin, the founder of IT'SUGAR, and the development (and aggressive expansion) of Plaintiff's stores and creation of its candy labels. *See, e.g.*, Decl. of Jeffrey Rubin, Ex. 9, ECF No. 11, at 13 (an article from *Fortune Magazine*).  The only article describing

12

the *physical look* of the stores does so in a caption under the same photo from the advertisement described above.[5] 2nd Decl. of Jeffrey Rubin, Ex. D, ECF No. 47-8, at 12. The caption reads, "Bold colors and wide entrances are part of the stores' design schemes." Plaintiff also includes photographs found on social media. However, those photographs' focal points are not Plaintiff's purported trade dress; instead, they are of the candy sold at the store. *See* Supp. Decl. of Nicole Sheehan, Exs. A, B, ECF No. 47-10, at 5–26. Indeed, despite its argument, Plaintiff provides little evidence to support it, and this weighs against a finding of secondary meaning.

The fifth factor requires that the Court focus on evidence of attempts to plagiarize or copy Plaintiff's trade dress. I Love Sugar contends that Plaintiff has failed to show evidence of intentional copying of Plaintiff's "protectable" trade dress. Memo. in Opp'n to Mot. for Prelim. Inj. 31–32. Above, this Court summarized the evidence Plaintiff has proffered to show that Mr. Oaknin copied its purported trade dress. That evidence, of course, was sufficient to shift the burden of persuasion from Plaintiff to I Love Sugar. Despite the evidence, however, the Court is not convinced that this evidence of copying shows a likelihood that Plaintiff's trade dress has acquired a secondary meaning. Other than Mr. Oaknin's apparent copying of certain parts or elements, Plaintiff points to no evidence of *others* attempting to copy its trade dress. Furthermore, I Love Sugar provides evidence to explain Mr. Oaknin's copying. Indeed, I Love Sugar makes no bones about copying from candy stores around the country. In his affidavit, Mr. Oaknin describes his research and the elements of other high-end candy stores that he ultimately incorporated into his design. Decl. of David Oaknin, ECF No. 39. Many of the elements, like bulk candy fixtures, appear to be common in high-end candy stores. He also identifies the differences between the design of his store and Plaintiff's National Trade Dress and Myrtle Beach Trade Dress, such as

---

[5] The article also includes a photo of what appears to be a round bulk candy fixture in one of Plaintiff's stores. 2nd Decl. of Jeffrey Rubin, Ex. D, ECF No. 47-8, at 11.

13

gummy bear chandeliers and a mural of mermaids swimming among Swedish fish. In short, the Court finds the evidence proffered by I Love Sugar particularly shows only the use of certain elements of Plaintiff's trade dress (such as its bulk candy fixtures); the Court cannot find that Mr. Oaknin—or anyone else for that matter—has copied Plaintiff's "total image" in order to trade on its goodwill. *Cf. Devan Designs*, 1992 WL 511694, at *11 (reasoning that "there may be an even more likely reason why one might copy another's trade dress such as to capitalize on a particularly attractive or saleable product design" rather than "to benefit from the other's goodwill").

Sixth and finally, I Love Sugar argues that the length and exclusivity of use of Plaintiff's trade dress does not favor a finding of secondary meaning. It again highlights the fact that Plaintiff's stores have not had a consistent overall design throughout its stores since its first store opened in 2006. Memo. in Opp'n to Mot. for Prelim. Inj. 27. Moreover, it points out that the identified components of Plaintiff's trade dress are also used by other high-end candy stores, such as Dylan's and Sugar Factory. *Id.* In turn, Plaintiff emphasizes its consistent use of its fixtures along with its irreverent images. Reply in Supp. of Mot. for Prelim. Inj. 3–8. Particularly troubling for Plaintiff's case, however, is its use its bulk candy fixtures and lollipop stands under other labels. Plaintiff operates the FAO SCHWEETZ department at the FAO Schwartz toy store in New York City, as well as the CANDYLAND- and WONKA-labeled candy department at the Toys 'R Us flagship store in New York's Times Square. In those departments, identical fixtures are used to display candy. Decl. of Annabelle Castillo Cohen, Exs. C, D, ECF Nos. 43-3, 43-4. Plaintiff dismisses I Love Sugar's argument that its use of its fixtures in those departments is significant. Reply in Supp. of Mot. for Prelim. Inj. 8–10. Plaintiff emphasizes that the only trade dress at issue is its identified National Trade Dress and Myrtle Beach Trade Dress. *Id.* at 9. However, it appears that Plaintiff's use of its fixtures under other labels bolsters I Love Sugar's argument that the

14

fixtures are a common element among other high-end candy stores. The Court is hesitant to find such a common feature in the industry acquires secondary meaning when it is coupled with images of irreverence.

In examining these factors, the Court is guided by the reasoning of the district court in *Devan Designs*, in which a motion for a preliminary injunction was denied. Despite evidence of copying, the court held that, [w]here all the factors so clearly militate against a finding of secondary meaning, the court feels warranted in finding the presumption rebutted." *Devan Designs*, 1992 WL 511694, at *11. Indeed, this Court emphasizes that a trade dress is the "total image and overall appearance." While Plaintiff has identified some consistent fixtures and designs throughout its stores, the Court, in light of I Love Sugar's rebuttal, finds that Plaintiff has failed to make an adequate showing of a likelihood of success for the purposes of a granting a motion for a preliminary injunction. The Court is not convinced at this stage that Plaintiff's purported trade dress—both nationally and in Myrtle Beach specifically—have acquired a secondary meaning so as to adequately "identify the source of the product rather than the product itself."

## II.  Remaining Factors

Absent a sufficient showing of inherent distinctiveness or secondary meaning, a plaintiff has not met all of the elements necessary to prevail in a trade dress infringement case. *See Tools USA*, 87 F.3d at 657. Thus, it is not necessary for the Court to address Plaintiff's contentions that its purported National Trade Dress and Myrtle Beach Trade Dress is non-functional or that the opening of I Love Sugar's store presents a likelihood of confusion that would rise to an infringement.[6]

---

[6] Plaintiff provides very little argument that its trade dress is non-functional. It contends that the shapes of its fixtures "add nothing to the usefulness, strength, or integrity of the fixtures and actually increase the cost of manufacturing the fixtures." Memo. in Supp. of Mot. for Prelim. Inj. 23. Moreover, it maintains that "the particular combination of these elements is not competitively necessary in the industry in which the parties compete or in any other industry." *Id.* Beyond those

Furthermore, as Plaintiff has not established a likelihood of success on the merits as to secondary meaning, Plaintiff cannot make a clear showing under the first part of the *Winter* standard. Accordingly, the Court need not analyze the remaining parts of the *Winter* test: whether irreparable injury is likely, and that injunctive relief is favored by the equities and the public interest.[7] 555 U.S. at 20. Indeed, as noted above, Plaintiff must meet all four requirements in order to obtain a preliminary injunction. Accordingly, the Court finds that Plaintiff's motion for a preliminary injunction must be denied.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's motion for a preliminary injunction (ECF No. 8) is **DENIED**.

**IT IS SO ORDERED.**

                                                 s/ R. Bryan Harwell
                                                 R. Bryan Harwell
                                                 United States District Judge

November 19, 2013
Florence, South Carolina

---

conclusory statements, Plaintiff provides no evidence of non-functionality other than the statements of Mr. Rubin. *See* Decl. of Jeffrey Rubin 5. As for likelihood of confusion, the Court is not persuaded that Plaintiff, which has shown some evidence of actual confusion, has adequately shown that consumers were confused as a result of an association of Plaintiff's purported trade dress to Plaintiff. *See, e.g.*, *Rally's, Inc. v. Int'l Shortstop, Inc.*, 776 F.Supp. 451, 457 (E.D. Ark. 1990) (noting that customer confusion can result for other reasons, such as an unfamiliarity with either store). As suggested in footnote 1, the Court is of the opinion that Plaintiff's evidence of confusion is more relevant to I Love Sugar's *signage*—especially due to the fact that much of the actual confusion shown arose from employment inquiries before I Love Sugar even opened. There is no evidence the candidates for employment had seen I Love Sugar's store's interior.

[7] Like the district court in *Campbell Sales Group*, this Court must emphasize that its findings in this order "are limited in effect to resolving Plaintiff's motion for a preliminary injunction. Discovery and full development of the record during further proceedings may lead to a different result, but Plaintiff's prospects on the merits are too speculative at this point to support preliminary relief." 2010 WL 3945350, at * 9 n.8.